**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| RICKEY MOORE, )  | CASE NO. 1:16CV2832 |
| ) | |
| Plaintiff, ) | JUDGE SARA LIOI |
| ) | |
| v. ) | MAGISTRATE JUDGE |
| ) | JONATHAN D. GREENBERG |
| NANCY A. BERRYHILL, ) | |
| Acting Commissioner ) | |
| of Social Security, ) | |
| ) | **REPORT AND** |
| Defendant. ) | **RECOMMENDATION** |

Plaintiff, Rickey Moore ("Plaintiff" or "Moore"), challenges the final decision of

Defendant, Nancy A. Berryhill,[1] Acting Commissioner of Social Security ("Commissioner"),

denying his applications for Period of Disability ("POD") and Disability Insurance Benefits

("DIB"), under Title II of the Social Security Act, 42 U.S.C. §§ 416(i) & 423 *et seq.* ("Act").

This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned

United States Magistrate Judge pursuant to an automatic referral under Local Rule 72.2(b) for a

Report and Recommendation.  For the reasons set forth below, the Magistrate Judge

recommends that the Commissioner's final decision be AFFIRMED.

## I.    PROCEDURAL HISTORY

In May 2013, Moore filed applications for POD and DIB, alleging a disability onset date

of October 10, 2010 and claiming he was disabled due to chronic back pain and arthritis with

---

[1] On January 23, 2017, Nancy A. Berryhill became the Acting Commissioner of Social
Security.

prolonged standing, bending, and lifting. (Transcript ("Tr.") 14, 107, 127.) The applications were denied initially and upon reconsideration, and Moore requested a hearing before an administrative law judge ("ALJ"). (Tr. 14, 93-95, 98-100, 101.)

On May 20, 2015, an ALJ held a hearing, during which Moore, represented by counsel, and an impartial vocational expert ("VE") testified. (Tr. 29-71.) On September 21, 2015, the ALJ issued a written decision finding Moore was not disabled. (Tr. 14-27.) The ALJ's decision became final on September 16, 2016, when the Appeals Council declined further review. (Tr. 1-4.)

On November 21, 2016, Moore filed his Complaint to challenge the Commissioner's final decision. (Doc. No. 1.) The parties have completed briefing in this case. (Doc. Nos. 13, 15.) Moore asserts the following assignment of error:

(1)     The Administrative Law Judge erred at step five of the sequential evaluation in concluding that Plaintiff is capable of performing light work activity.

(Doc. No. 13 at 6.)

## II.   EVIDENCE

### A.     Personal and Vocational Evidence

Moore was born in April 1961 and was fifty-two (52) years-old on his date last insured, making him a "person closely approaching advanced age" under social security regulations. (Tr. 22.) *See* 20 C.F.R. §§ 404.1563(d) & 416.963(d). He completed the eleventh grade and is able to communicate in English. (*Id.*) He has past relevant work as a detailer, auto body repair helper, and patient transfer valet. (Tr. 22.)

2

**B.     Relevant Medical Evidence**[2]

The record reflects Moore was involved in a motor vehicle accident in the 1990's.  (Tr. 323.)  He suffered liver injuries, multiple lower right rib fractures, and right hip trauma.  (*Id.*)  Moore indicated he gradually developed pain over the right rib region and, in approximately 2006, "the pain started to progress further, however he continued to tolerate it."  (*Id.*)

On October 22, 2010, Moore presented to Jeffrey Galvin, M.D., for evaluation of chronic musculoskeletal pain.  (Tr. 338-341.)  On examination, Dr. Galvin noted tenderness over Moore's lumbosacral ligament, negative straight leg raise, normal reflexes in the lower extremities, and no focal deficit.  (Tr. 340.)  He also observed "questionable weakness in the dorsiflexors of the right foot compared to the left."  (*Id.*)  Dr. Galvin assessed (1) thoracic or lumbosacral neuritis or radiculitis, unspecified, with questionable lumbar radiculopathy; (2) pain in joint, pelvic region and thigh; (3) chest wall pain; and (4) "questionable gout" in Moore's feet.  (Tr. 340-341.)  He ordered x-rays of Moore's lumbar spine, right hip, and right ribs; and prescribed steroids and muscle relaxers.  (*Id.*)

Moore underwent the x-rays on October 27, 2010.  (Tr. 342-344.)  The lumbar x-ray showed straightening of the lumbar lordosis and degenerative changes, including "very minimal" disc space narrowing at L5-S1 with "marginal osteophytic changes to varying degrees . . . at all levels."  (Tr. 343.)  The right rib x-ray showed (1) no active cardiovascular or pulmonary abnormality; (2) some eventration of the right hemidiaphragm with streaky at the right base that suggested some crowding of the bronchovasculature; (3) a remote subacute fracture of the

---

[2] The Court's recitation of the medical evidence is not intended to be exhaustive, and is limited to the evidence cited in the parties' Briefs.

posterior right 11th rib; and (4) bony bridging between the posterior 9th and 10th ribs. (Tr. 342-343.) The right hip x-ray was "essentially unremarkable . . . with some minimal joint space narrowing inferiorly." (Tr. 344.)

Moore returned to Dr. Galvin on December 3, 2010. (Tr. 334-337.) He reported "no real change" after taking steroids and muscle relaxers. (Tr. 334.) Dr. Galvin prescribed Neurontin and referred Moore to the Department of Physical Medicine and Rehabilitation ("PM&R"). (Tr. 335.)

Several months later, on March 4, 2011, Moore presented to Anuj Daftari, M.D., at the PM&R Clinic. (Tr. 323-326.) He complained of right lower rib pain, which he described as "dull, achy, 6/10, constant, worsening throughout the day, radiates down to left hip region, worse with lifting heavy objects, activity, and sleeping on that side, improved with massages from his wife, and soaking in hot water." (Tr. 323.) Moore also reported sharp, intermittent lower back pain, which he rated an 8-9 on a scale of 10. (*Id*.) He indicated no radiating pain, but did complain of numbness and tingling to his right ankle. (Tr. 323-324.) On examination, Dr. Daftari found as follows:

BACK EXAM: Pelvis was symmetric. Lumbar lordotic curvature was normal. There was no evidence of scoliosis. [Range of motion] was normal with increased pain over right lower ribs during flexion to ipsilateral side and in low back on flexion and extension. Palpatory exam revealed tenderness at the lower portion of the right ribs, no tenderness over lumbosacral region. There was fullness Bilateral lumbosacral paraspinal muscles. There was no evidence of any trigger points. [Straight leg raise] test was negative bilaterally.

NEUROLOGIC EXAM: Motor strength was 5/5 throughout bilateral upper and lower extremity. Sensory exam revealed normal sensation in all dermatomes regions of bilateral upper and lower extremities. Reflexes were 1+ over bilateral quadriceps and gastrocnemius. Hoffman was negative bilaterally. Babinski was downgoing bilaterally. Fine motor coordination was normal. Gait was normal.

(Tr. 325.)  Dr. Daftari assessed right lower rib pain "which may remain chronically," and low back pain with radicular symptoms of numbness and tingling down the right leg.  (*Id.*)  She advised Moore to continue taking Neurontin, prescribed a TENS unit and lidocaine gel, and recommended Moore start a home exercise program.  (Tr. 326.)

After nearly a year-long gap in treatment, Moore returned to Dr. Galvin on February 7, 2012.  (Tr. 190-193.)  He complained of right-sided chest wall and hip tenderness "dating back to a remote [motor vehicle accident]."  (Tr. 190.)  Moore reported "limited if any improvement" with Neurontin.  (*Id.*)  Dr. Galvin noted Moore had been referred to PM&R in December 2010 "but has done a poor job following up with either them or with me since that time."  (*Id.*)  Examination revealed normal pulses, negative straight leg raise on the right, "slightly tight and hamstrings on that side," and normal passive range of motion at the right hip.  (Tr. 191.)  Dr. Galvin assessed chest wall pain and prescribed Motrin 800 mg, three times per day.  (*Id.*)

On March 17, 2012, Moore presented to Dr. Galvin with complaints of "mild generalized myalgias and arthalgias dating back to a remote [motor vehicle accident] 20 years ago."  (Tr. 241-245.)  Moore reported "feeling good" and indicated his symptoms had improved "over the last few months after going on Motrin."  (Tr. 241.)

On May 16, 2012, Moore presented to Katherine Payne, M.D., at the PM&R Clinic for follow-up regarding his right lower rib and lower back pain.  (Tr. 236-240.)  Moore reported increased right hip pain, weakness in his right leg, frequent tripping, and increased groin pain when getting in and out of the car.  (Tr. 236.)  He also complained his leg "gives out on him," and reported numbness in the posterior aspect of his thigh and calf.  (*Id.*)  Moore rated his pain an 8 on a scale of 10, and described it as "constant but varies in intensity."  (*Id.*)  He indicated

his pain was aggravated by changes in the weather, bending, and prolonged walking (more than 30 minutes); and improved with soaking in hot water and laying down. (*Id.*) On examination, Dr. Payne noted:

> Back Exam: Pelvis was symmetric. Lumbar lordotic curvature was normal. There was no evidence of scoliosis. [Range of motion] was normal with increased pain in low back with both flexion and extension. Palpatory exam revealed no tenderness over lumbosacaral region. There was no evidence of spasm. There was no evidence of any trigger points. [Straight leg raise] test was negative bilaterally with increased low back pain bilaterally.
>
> Neurologic Exam: Motor strength was 5/5 throughout bilateral upper and lower extremity. Sensory exam revealed normal sensation in all dermatomes regions of bilateral upper and lower extremities. Reflexes were 1+ over bilateral quadriceps and gastrocnemius. Babinski was downgoing bilaterally. Fine motor coordination was normal. Gait was normal. Heel and toe walk intact.

(Tr. 238.) Dr. Payne referred Moore to physical therapy for a TENS unit trial, modalities, core stabilization, strengthening, and home exercise program. (*Id.*)

Moore presented for physical therapy on July 12, 2012. (Tr. 226-230.) He reported having difficulty with household chores, including donning/doffing shoes, dressing, cooking, cleaning, shopping, vacuuming, laundry, lifting and carrying. (Tr. 227.) He did state, however, that he could lift items such as a gallon of milk without pain and wash his car daily. (*Id.*) He rated his lower back pain an 8 on a scale of 10, and reported worsening with prolonged sitting, standing, and walking; sleeping; lifting; bending; and ascending/descending stairs. (*Id.*)

On examination, Moore's range of motion was within functional limits but "painful in all directions." (*Id.*) Muscle strength in his bilateral lower extremities was 5/5 and slightly reduced at 4/5 in his right hip. (*Id.*) The physical therapist also noted negative straight leg raise on the right, tenderness around the 10th to 12th ribs, and no focal weakness. (Tr. 227-228.) Moore was able to heel and toe walk, had an "independent gait with no assistive device," and reported the

ability to independently use the stairs at home. (Tr. 228.) The physical therapist found Moore presented "with painful [active range of motion], decreased strength and increased pain leading to decreased functional ability." (*Id.*) She also noted poor posture, poor body awareness, and poor biomechanics. (*Id.*)

Several days later, on July 18, 2012, Moore presented to Moeid Khan, M.D., at the PM&R Clinic. (Tr. 220-225.) He complained of lower back pain radiating to his lateral right hip and posterior thigh to ankle. (Tr. 220.) Moore rated the pain an 8 on a scale of 10, and described it as dull and throbbing. (*Id.*) He also complained of numbness in his arm and down his leg, morning back stiffness, and loss of balance. (Tr. 220-221.) Moore indicated physical therapy "helped pain slightly but feels [home exercise program] not helpful for the pain." (Tr. 221.) On examination, Dr. Khan found as follows:

> Back Exam: Pelvis was symmetric. Lumbar lordotic curvature was normal. There was no evidence of scoliosis. [Range of motion] was mildly decreased in all planes. Iliac crest is symmetric. Increased concordant pain in low back with both flexion and extension. Palpatory exam revealed concordant tenderness to the LS junction and SI joints. There was no evidence of spasm. There was no evidence of any trigger points. [Straight leg raise] test was negative bilaterally.
>
> Neurologic Exam: Motor strength was 5/5 throughout bilateral upper and lower extremity. Sensory exam revealed normal sensation in all dermatomes regions of bilateral upper and lower extremities. Reflexes were 1+ over bilateral quadriceps and gastrocnemius. Babinski was downgoing bilaterally. Fine motor coordination was normal. Rhomberg is negative. Gait was slow and slightly wide based and pt with difficulty with tandem, heel and toe gaits.

(Tr. 222-223.) Dr. Khan assessed chronic low back pain with radicular symptoms, "concern for spondylitic spine," and "concern for neuropathy as balance is an issue." (Tr. 223.) He ordered a lumbar x-ray, EMG, and TENS unit trial, and advised Moore to "continue with physical therapy as the first session was successful in decreasing pain." (*Id.*)

Moore underwent a lumbar spine x-ray on July 20, 2012. (Tr. 196.) This x-ray revealed degenerative changes of the lumbar spine with no acute osseous abnormality. (*Id*.)

On that same date, Moore returned for his second physical therapy session. (Tr. 217-219.) He complained of low back pain, which he rated a 7 on a scale of 10. (*Id*.) Moore stated he had complied with his home exercise program, but the therapist noted Moore was unable to verbally recall or demonstrate the exercises. (*Id*.) Examination revealed a slow and antalgic gait. (*Id*.)

Moore presented for his third physical therapy session on July 30, 2012. (Tr. 286-288.) He stated he felt "the same" and had "been doing the exercises and they have been making him hurt more." (*Id*.) On examination, Moore's gait was again slow and antalgic. (*Id*.) The physical therapist administered a TENS unit trial due to Moore's continued pain. (*Id*.) He noted a decrease in pain from 7/10 to 5/10 after treatment. (*Id*.)

On August 9, 2012, Moore underwent an EMG of his bilateral lower extremities. (Tr. 209-213.) The EMG was abnormal and showed active signs of denervation in the dorsal primary ramus at the L4/L5 level paraspinals. (Tr. 194, 197.) Electrodiagnostically, there was no evidence of radiculopathy to the muscles distal to this point, or of peripheral neuropathy. (*Id*.)

Moore returned for physical therapy sessions on August 13 and 20, 2012. (Tr. 203-208.) On both occasions, Moore's gait was noted to be slow and antalgic. (*Id.*) At the latter visit, Moore reported "the pain is always a 7 regardless of exercise or activity." (Tr. 203.) The physical therapist noted Moore was "currently independent with [home exercise program] however [he] reports no functional progress with therapy or decrease in pain level at this time." (Tr. 204.) Moore was discontinued from physical therapy as "he is not making functional

improvement at this time" and advised to continue with his home exercise program.  (*Id.*)

On September 26, 2012, Moore returned to Dr. Khan at the PM&R Clinic.  (Tr. 194-198.) He complained of continued low back pain and right hip pain, but reported no numbness or radiation.  (Tr. 194.)  Moore indicated his pain was aggravated by activity, walking, standing, bending, back extension and damp weather; and alleviated by Naproxen, a heating pad, and a hot shower.  (*Id.*)  He reported doing his home exercise program consistently.  (*Id.*)  On examination, Dr. Khan found as follows:

> Back Exam:  Pelvis was symmetric.  Lumbar lordotic curvature was normal. There was no evidence of scoliosis. [Range of motion] was mildly decreased in all planes.  Iliac crest is symmetric.  Increased concordant pain in low back with both flexion and extension and palpatory exam revealed concordant tenderness to the LS junction and SI joints and right lower paraspinals. There was no evidence of spasm.  There was no evidence of any trigger points. [Straight leg raise] test was negative bilaterally. + FABER bilateral.

> Neurologic Exam: Motor strength was 5/5 throughout bilateral upper and lower extremity. Sensory exam revealed normal sensation in all dermatomes regions of bilateral upper and lower extremities.  Reflexes were 1+ over bilateral quadriceps and gastrocnemius.  Babinski was downgoing bilaterally. Fine motor coordination was normal.  Rhomberg is negative. Gait was slow and slightly antalgic.

(Tr. 196.)  Dr. Khan changed Moore's medication to Mobic, and advised him to continue with his home exercise program.  (Tr. 197.)

Over eight months later, on June 7, 2013, Moore presented to Julia Bruner, M.D., at Express Care with complaints of pain in his right shoulder, right side, and lower back.  (Tr. 256-263.)  He also reported right upper leg numbness, resulting in his leg "giving out" and causing him to stumble and fall.  (Tr. 256.)  On examination, Dr. Bruner noted full range of motion in his upper and lower extremities, crepitus in his right shoulder, antalgic gait, weakness on the right lower extremity, normal sensation, and 3+ reflexes bilaterally.  (Tr. 257.)  Dr. Bruner prescribed

Voltaren and Zantac, and ordered an x-ray of his lumbar spine. (*Id.*)

Moore underwent the lumbar x-ray that same day. (Tr. 262-263.) It revealed the following:

> There are degenerative changes of the lumbar spine. Although the disc spaces are preserved and vertebral body height is maintained marginal osteophytes are present at multiple levels. No acute fracture nor abnormal subluxation.
>
> Visualized pedicles are intact as are the sacroiliac Joints. Some increased density along the iliac and sacral sides of the sacroiliac joints. This was present previously. No significant interval progression in the degenerative process when compared to the prior [x-ray dated July 20, 2012].

(Tr. 263.)

Several weeks later, on June 26, 2013, Moore returned to Dr. Khan at the PM&R Clinic. (Tr. 248-252.) He indicated he had stopped taking both the Voltaren and Mobic, and was no longer consistently engaging in his home exercise program. (Tr. 248.) Moore reported his "pain has not worsened and has not improved." (*Id.*) He complained of (1) right lateral back pain with radiation inferiorly and to the right lateral leg to toes and occasional numbness of his right leg and toes; and (2) right hip pain with radiation to the anterior hip and groin. (*Id.*) Moore denied any lower extremity weakness, but stated he loses his balance. (*Id.*) On examination, Dr. Khan found as follows:

> Back Exam: Pelvis was symmetric. Lumbar lordotic curvature was normal. There was no evidence of scoliosis. [Range of motion] was mildly decreased in all planes. Iliac crest is symmetric. Mild concordant pain in low back with both fiexion and extension and palpatory exam revealed mild concordant tenderness to the LS junction and SI joints and right lower paraspinals. There was no evidence of spasm. There was no evidence of any trigger points. SLR test was negative bilaterally with right hip pain. + FABER bilateral.
>
> Neurologic Exam: Motor strength was 5/5 throughout bilateral upper and lower extremity. Sensory exam revealed normal sensastion in all dermatomes regions of bilateral upper and lower extremities. Reflexes were 2+ over bilateral quadriceps

and 1+ gastrocnemius. Babinski was downgoing bilaterally.  Fine motor coordination was normal.  Gait [normal] but slow with decreased right flexion.

(Tr. 250-251.)  Dr. Khan assessed ongoing low back pain with recurrent right radicular symptoms that has "persisted with neurontin use, [physical therapy], and activity modification." (Tr. 251.)  He indicated Moore had sacroilitis but noted "neuropathy has been ruled out."  (*Id.*)  Dr. Khan prescribed Naproxen and Neurontin, advised Moore to continue his home exercise program, and ordered a lumbar MRI.  (*Id.*)

Moore underwent the lumbar MRI on July 10, 2013.  (Tr. 253-254.)  It showed mild degenerative changes of the L3-L4 disc, and mild broad-based disc bulges at L3-L4 and L4-L5.  (Tr. 254.)  There was no significant thecal sac compression or foraminal stenosis narrowing, or nerve root compression.  (*Id.*)

On November 5, 2013 (several months after Moore's DLI), Moore returned to Dr. Khan at the PM&R Clinic.  (Tr. 349-355.)  He complained of pain in his right lower rib and right lateral hip.  (Tr. 349.)  Moore indicated he was currently taking Gabapentin and Ibuprofen, which helped moderately.  (*Id.*)  He was not doing his home exercise program, but did report using his stationary bike.  (*Id.*)  He stated he could stand for 15 to 20 minutes, sit for 30 minutes, and bend occasionally.  (*Id.*)  On examination, Dr. Khan noted similar examination findings to Moore's previous visit.  (Tr. 352.)  He advised Moore that he "needs to do [home exercises] and can consider [physical therapy] refresher," but noted Moore "is not interested."  (Tr. 353.)  Dr. Khan further indicated as follows: "Had discussion for Return to work, and patient does not want to seek other employment options.  He does not appear motivated, and attempted to have patient engaged in the idea of return to work and he plans to seek disability instead."  (*Id.*)

C.      **State Agency Reports**

On September 7, 2013, state agency physician Leslie Green, M.D., reviewed Moore's medical records and completed a Physical Residual Functional Capacity ("RFC") Assessment. (Tr. 77-79.)  Dr. Green found Moore could lift and carry 20 pounds occasionally and 10 pounds frequently; stand and/or walk for about 6 hours in an 8 hour workday; and sit for about 6 hours in an 8 hour workday.  (Tr. 77.)  She also determined Moore had an unlimited capacity to push/pull and kneel; could frequently crouch and crawl; could occasionally stoop, balance, and climb ramps and stairs; and could never climb ladders, ropes, and scaffolds.  (Tr. 77-78.)  Dr. Green further opined Moore was limited to frequent overhead reaching with his right upper extremity due to right shoulder pain, and should avoid concentrated exposure to extreme cold, vibration, and hazards.  (Tr. 78-79.)

On December 3, 2013, state agency physician Lynne Torello, M.D., reviewed Moore's medical records and completed a Physical RFC Assessment.  (Tr. 88-90.)  Dr. Torello affirmed Dr. Green's opinion with the exception that she found Moore was limited to frequent (as opposed to unlimited) kneeling and could tolerate unlimited exposure to extreme cold and vibration.  (*Id.*)

**D.  Hearing Testimony**

During the May 20, 2015 hearing, Moore testified to the following:

- He lives with his wife and two children (ages 19 and 24) on the second floor of a two-story home.  (Tr. 37, 62-63.)  He has been married for 26 years.  (Tr. 37-38.)  His wife is on disability.  (*Id.*)  He took GED classes, but did not take the GED test.  (Tr. 55.)

- He was injured in a motor vehicle accident in 1989.  (Tr. 53-54.)  As a result of this accident, he suffered four broken ribs.  (*Id.*)

- From 2000 to 2005, he worked at a hospital.  (Tr. 48-50.)  His job responsibilities included transporting patients and parking cars.  (*Id.*)  At times,

12

he lifted up to 30 pounds.  (*Id.*)  From 2005 to 2007, he worked as a detailer at a car dealership.  (Tr. 46-47.)  His job responsibilities included washing and buffing the cars, prepping the fenders, and doing detailing work.  (Tr.  46-47, 56-57.)  He last worked in 2009, loading and unloading trucks with clothing. (Tr. 44-46.)  In this position, he was required to lift over 50 pounds and drove a box truck.  (*Id.*)  He was let go because he was not "performing fast enough." (*Id.*)

•   He can no longer work because he experiences pain and stiffness in his lower back, shoulder, and hip.  (Tr. 52-53.)  The pain in his back also travels down his right leg.  (Tr. 61-62.)  He has to change positions frequently due to his pain. (Tr. 58.)  He can stand for 10 to 15 minutes at the most, can lift no more than 10 pounds, and can walk down the block and back before needing to rest.  (Tr. 57-58.)  He wears a foot brace to help him walk better, and sometimes uses a cane. (Tr. 61.)  His most comfortable position is lying down on his back, which he does two to three times per day.  (Tr. 59.)  The pain wakes him up at night.  (Tr. 59-60.)

•   He takes pain medication for his lower back condition, and gets "some relief" from soaking in a hot tub.  (Tr. 59-60, 61.)  His doctor prescribed a TENS unit, but he did not get it because it wasn't covered by insurance.  (Tr. 60.)  He has had two rounds of physical therapy, but it did not help.  (*Id.*)  In fact, when he finished physical therapy, he was "in more pain."  (*Id.*)  His doctors recently recommended he undergo injections.  (Tr. 61.)

•   He has trouble dressing himself, and needs help getting in and out of the bathtub.  (Tr. 61-62.)  He can climb the stairs to his house, but has to go slowly and take it one step at a time.  (Tr. 62-63.)  He does the grocery shopping and "a little cooking."  (Tr. 38-39.)  His son does the laundry, and both children do the house cleaning.  (*Id.*)  Sometimes he mows the grass, but he has trouble pushing the mower.  (Tr. 39, 63.)  He tries to do his home exercises and ride his bike a short distance. (Tr. 39.)  He drives short distances but his son drives him places most of the time.  (Tr. 40.)  He watches videos on YouTube, plays chess, and goes to church.  (Tr. 41-43.)

The VE testified Moore had past work as a delivery driver (unskilled, medium but performed as heavy); detailer (unskilled, medium); auto body repair helper (unskilled, medium); and combination patient transporter/valet (unskilled, medium).  (Tr. 66-67.)  The ALJ then posed the following hypothetical question:

I'd like you to consider a person with the same age, education, and past work

13

> as the claimant who is able to occasionally lift and carry 20 pounds and
> frequently lift and carry 10 pounds; is able to stand and walk six hours of an
> eight hour workday; is able to sit for six hours of an eight hour workday; would
> have unlimited push and pull other than shown for lift and/or carry.
>
> Could occasionally climb ramps and stairs; could never climb ladders, ropes, or
> scaffolds; could occasionally balance and stoop; and could frequently crouch,
> kneel, and crawl; would have limited overhead reaching with the right upper
> extremity to frequent. This individual must avoid concentrated exposure to
> extreme cold; avoid concentrated exposure to vibration; and avoid concentrated
> exposure to hazards; and by that I mean hazardous machinery and unprotected
> heights.

(Tr. 67.)

The VE testified the hypothetical individual would not be able to perform Moore's past work as a delivery driver, detailer, auto body repair helper, and/or combination patient transporter/valet, as either actually or generally performed. (Tr. 67-68.) The VE explained the hypothetical individual would, however, be able to perform other representative jobs in the economy, such as assembler of small products (light, unskilled); electronic sorter (light, unskilled); and paint spray inspector (light, unskilled). (Tr. 68.)

The ALJ then asked the VE to assume the first hypothetical with the additional limitation that the hypothetical individual "might be absent from work two or more days per month due to issues with chronic pain." (Tr. 68.) The VE testified there "would be no work if there's more than two" absences per month. (Tr. 69.)

The ALJ then asked a second hypothetical, as follows:

> I would like you to consider a person with the same age, education, and past work
> as the claimant who is able to occasionally lift and carry ten pounds and
> frequently lift and carry five pounds; is able to stand and walk two hours of an
> eight hour workday; is able to sit for six hours of an eight hour workday; would
> have unlimited push and pull other than shown for lift and/or carry.
>
> Could occasionally climb ramps and stairs; could never climb ladders, ropes, or

14

scaffolds; could occasionally balance and stoop; and frequently crouch, kneel, and crawl; would be limited to frequent upper overhead reaching with the right upper extremity; and must avoid concentrated exposure to extreme cold; and avoid concentrated exposure to vibration; and avoid concentrated exposure to hazards, and by that I mean hazardous machinery and unprotected heights.

(Tr. 69.)  The VE testified the hypothetical individual would not be able to perform Moore's past work and would be limited to sedentary work.  (Tr. 69-70.)

## III.    STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315 and 404.1505(a).

A claimant is entitled to a POD only if: (1) he had a disability; (2) he was insured when he became disabled; and (3) he filed while he was disabled or within twelve months of the date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4).  *See also Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010);  *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time of the disability application.  20 C.F.R. §§ 404.1520(b) *and* 416.920(b).  Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. §§ 404.1520(c) *and* 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work

activities." *Abbot*, 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience. *See* 20 C.F.R. §§ 404.1520(d) *and* 416.920(d).  Fourth, if the claimant's impairment or combination of impairments does not prevent him from doing his past relevant work, the claimant is not disabled.  20 C.F.R. §§ 404.1520(e)-(f) *and* 416.920(e)-(f).  For the fifth and final step, even if the claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c), *and* 416.920(g).

Here, Moore was insured on his alleged disability onset date, October 10, 2010, and remained insured through June 30, 2013, his date last insured ("DLI.")  (Tr. 14.)  Therefore, in order to be entitled to POD and DIB, Moore must establish a continuous twelve month period of disability commencing between these dates.  Any discontinuity in the twelve month period precludes an entitlement to benefits.  *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

### IV.   SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1. The claimant last met the insured status requirements of the Social Security Act on June 30, 2013.

2. The claimant did not engage in substantial gainful activity during the period from his alleged onset date of October 10, 2010 through his date last insured of June 30, 2013 (20 CFR 404.1571 et seq.)

3. Through the date last insured, the claimant had the following severe

16

impairment: degenerative disc disease (lumbar) with right shoulder radiculopathy (20 CFR 404.1520(c)).

4.     Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.     After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except: He can occasionally lift and carry 20 pounds and frequently lift and carry ten pounds. He can stand and walk for six hours of an eight-hour workday. He can sit for six hours of an eight-hour workday. He is unlimited in his ability to push and/or pull other than shown for the lift and/or carry limitations. He can
occasionally climb ramps or stairs. He should never climb ladders, ropes or scaffolds. He can occasionally balance and stoop. He can frequently crouch, kneel and crawl. He is limited to frequent overhead reaching with his upper right extremity. He should avoid concentrated exposure to extreme cold and vibration. He should avoid concentrated exposure to workplace hazards, i.e., moving machinery and unprotected heights.

6.     Through the date last insured, the claimant was unable to perform any past relevant work (20 CFR 404.1565).

7.     The claimant was born on April ** 1961 and was 52 years old, which is defined as an individual closely approaching advanced age, on the date last insured (20 CFR 404.1563).

8.     The claimant has a limited education and is able to communicate in English (20 CFR 404.1564).

9.     Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled (20 CFR 404.1568).

10.     Through the date last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 CFR 404.1569 and 404.1569(a)).

11.     The claimant was not under a disability, as defined in the Social Security Act, at any time from October 10, 2010, the alleged onset date, through June 30, 2013, the date last insured (20 CFR 404.1520(g)).

(Tr. 14-23.)

## V. STANDARD OF REVIEW

"The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 2011 WL 1228165 at * 2 (6th Cir. April 1, 2011). Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999)("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.") This is so because there is a "zone of choice"

within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g.,White v. Comm'r of Soc. Sec*., 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec*., 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir.1996); accord *Shrader v. Astrue*, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI.  ANALYSIS

### *RFC*

Moore argues the ALJ's RFC Assessment is not supported by substantial evidence.

(Doc. No. 13.)  Specifically, he maintains that, "[w]hile the ALJ provides a recitation of much of the evidence, she fails to explain in her decision how this compelling evidence does not substantiate a more restrictive RFC."  (*Id*. at 8.)  Moore asserts the objective evidence and clinical examination findings support a restriction to sedentary work, and maintains the ALJ's stated reasons for finding otherwise are not supported by the record.  (*Id*. at 8-11.)

The Commissioner argues substantial evidence supports the ALJ's RFC.  (Doc. No. 15 at 8.)  She asserts "[t]he ALJ evaluated the medical evidence extensively, especially the evidence relating to his back pain and hip concerns."  (*Id.*)  The Commissioner maintains that, in finding Moore could perform a reduced range of light work, the ALJ properly considered the fact that clinical findings remained "consistently normal," the EMG showed no electrodiagnostic evidence of neuropathy or radiculopathy, and the MRI of Moore's lumbar spine showed no nerve root compression.  (*Id.*)  Finally, the Commissioner notes the ALJ's RFC finding is supported by the opinions of both Dr. Green and Dr. Torello.  (*Id.*)

The RFC determination sets out an individual's work-related abilities despite his or her limitations.  *See* 20 C.F.R. § 416.945(a).  A claimant's RFC is not a medical opinion, but an administrative determination reserved to the Commissioner.  *See* 20 C.F.R.§ 416.927(d)(2).  An ALJ "will not give any special significance to the source of an opinion on issues reserved to the Commissioner."  *See* 20 C.F.R.§ 416.927(d)(3).  As such, the ALJ bears the responsibility for assessing a claimant's RFC based on all of the relevant evidence, 20 C.F.R. § 416.946(C), and must consider all of a claimant's medically determinable impairments, both individually and in combination, S.S.R. 96-8p.

"In rendering his RFC decision, the ALJ must give some indication of the evidence

upon which he is relying, and he may not ignore evidence that does not support his decision, especially when that evidence, if accepted, would change his analysis." *Fleischer v. Astrue*, 774 F.Supp.2d 875, 880 (N.D. Ohio 2011) (citing *Bryan v. Comm'r of Soc. Sec.*, 383 Fed. Appx. 140, 148 (3d Cir. 2010) ("The ALJ has an obligation to 'consider all evidence before him' when he 'mak[es] a residual functional capacity determination,' and must also 'mention or refute [...] contradictory, objective medical evidence' presented to him.")). *See also* SSR 96–8p, at *7, 1996 SSR LEXIS 5, *20 ("The RFC assessment must always consider and address medical source opinions. If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted.")). While the RFC is for the ALJ to determine, however, it is well established that the claimant bears the burden of establishing the impairments that determine his RFC. *See Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999).

Here, the ALJ determined, at step two, that Moore suffered from the severe impairment of degenerative disc disease (lumbar) with right shoulder radiculopathy. (Tr. 16.) After determining Moore's impairments did not meet or equal the requirements of a listing, the ALJ proceeded at step four to consider Moore's self-reported symptoms and limitations, as well as the medical and opinion evidence regarding his physical impairments. (Tr. 16-21.) The ALJ first acknowledged Moore's allegations of chronic back pain, hip pain and sciatic nerve pain causing him to be "off balance." (Tr. 18.) The ALJ also noted Moore's allegations that he has problems dressing himself and performing daily chores, as well as his testimony that he wears a back brace and occasionally uses a cane. (*Id.*) The ALJ determined, however, Moore's statements regarding his impairments and their impact on his ability to work were "not entirely

credible" because "the objective evidence does not support his contentions regarding the severity, chronicity, and/or frequency of his symptoms." (*Id*.) The decision then recounts, at some length, the medical evidence of record, including objective test results and physical examination findings. (Tr. 18-21.) Specifically, the ALJ notes the results of (1) the October 2010 rib, lumbar, and hip x-rays; (2) the July 2012 and June 2013 lumbar x-rays; and (3) the July 2013 MRI of Moore's lumbar spine. (*Id*.) The ALJ acknowledged this imaging showed some degenerative changes, but also noted both the October 2010 right hip x-ray and the July 2013 lumbar MRI were "essentially unremarkable." (*Id*.)

The ALJ also discussed the many clinical examination findings in the record. In this regard, the ALJ acknowledged abnormal physical examination findings, such as decreased range of motion, pain, tenderness, weakness, positive Faber, crepitus of the right shoulder, and slow/antalgic gait. (Tr. 19-20.) However, the ALJ also noted that Moore's physicians often recorded normal examination findings, including 5/5 strength, negative straight leg raise, normal sensation, normal gait, full range of motion, and no evidence of trigger points or muscle spasm. (*Id*.) The ALJ then considered the opinion evidence of record, according "great weight" to the opinions of state agency physicians Drs. Green and Torello "as they are consistent with the evidence as a whole and the limitations have been incorporated into the residual functional capacity above." (Tr. 21.)

The ALJ then explained as follows:

The undersigned finds the claimant's allegations of disability and an inability to work are not fully credible. The claimant stated he was disabled due to an old rib fracture, back injury, arthritis, sciatic nerve pain, losing balance and shoulder pain. The medical evidence of record shows the claimant is able to move about effectively despite the pain and discomfort. He is able to use his hands for basic gripping and handling. The claimant stated he goes outside

22

daily, he is able to drive, he shops in stores for quick trips, he is capable of handling finances, and at times he mows the lawn. He has no difficulty following instructions. He enjoys watching television and spending time with his family. Multiple examinations show his lumbar curvature is normal and he does not have scoliosis. His range of motion was mildly decreased in all planes. There was no evidence of spasm or trigger points. Straight leg raise test was negative. Motor strength was 5/5 throughout all extremities and he had normal sensation in all extremities. His fine motor coordination was normal. His gait was normal but slow and he had decreased right flexion. On May 4, 2011, the claimant reported that he was currently looking of [sic] a job (Exhibit 2F, p. 78). The undersigned notes that the claimant's radiology reports and his examinations are generally good. The undersigned finds the objective medical evidence of record does not support more limitations than the residual functional capacity above.

(Tr. 21.) The ALJ formulated the following RFC for a reduced range of light work:

After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except: He can occasionally lift and carry 20 pounds and frequently lift and carry ten pounds. He can stand and walk for six hours of an eight-hour workday. He can sit for six hours of an eight-hour workday. He is unlimited in his ability to push and/or pull other than shown for the lift and/or carry limitations. He can occasionally climb ramps or stairs. He should never climb ladders, ropes or scaffolds. He can occasionally balance and stoop. He can frequently crouch, kneel and crawl. He is limited to frequent overhead reaching with his upper right extremity. He should avoid concentrated exposure to extreme cold and vibration. He should avoid concentrated exposure to workplace hazards, i.e., moving machinery and unprotected heights.

(Tr. 17.)

For the following reasons, the Court finds the RFC is supported by substantial evidence.

The ALJ correctly notes that, during the period at issue (i.e., October 2010 through July 2013), Moore's physicians recorded numerous normal physical examination findings, including the following:

- Negative straight leg raise, normal reflexes, and no focal deficit in October 2010. (Tr. 340.)

23

- Normal lordotic curvature, no evidence of scoliosis, normal range of motion with pain, negative straight leg raise, no evidence of trigger points, 5/5 motor strength, normal sensation, negative Hoffman, normal fine motor coordination, and normal gait, in March 2011.  (Tr. 325.)

- Negative straight leg raise, normal passive range of motion of right hip, and normal pulses, in February 2012.  (Tr. 191.)

- Normal lordotic curve, no evidence of scoliosis, normal range of motion with pain, no tenderness over lumbosacral region, no evidence of spasm or trigger points, negative straight leg raise bilaterally with pain, 5/5 motor strength bilaterally upper and lower extremities, normal sensory exam, normal fine motor coordination, normal gait, and intact heel and toe walk, in May 2012.  (Tr. 238.)

- Range of motion within functional limits with pain, 5/5 strength in bilateral lower extremities, negative straight leg raise, no focal weakness, intact heel to toe walk, independent gait with no assistive device, and ability to independently use the stairs, in July 2012.  (Tr. 226-230.)

- Normal lordotic curve, no evidence of scoliosis, no evidence of spasm or trigger points, negative straight leg raise, 5/5 motor strength throughout bilateral upper and lower extremities, normal sensory exam, normal fine motor coordination, and negative Rhomberg, in July 2012.  (Tr. 220-225.)

- Normal lordotic curve, no evidence of scoliosis, no evidence of spasm or trigger points, negative straight leg raise, 5/5 motor strength throughout bilateral upper and lower extremities, normal sensory exam, normal fine motor coordination, and negative Rhomberg, in September 2012.  (Tr. 196.)

- Normal lordotic curve, no evidence of scoliosis, no evidence of spasm or trigger points, negative straight leg raise, 5/5 motor strength throughout bilateral upper and lower extremities, normal sensory exam, normal fine motor coordination, and normal gait, in June 2013.  (Tr. 250-251.)

Moreover, while Moore correctly notes the presence of some abnormal clinical findings, the record reflects such findings were often described as mild or "slight."  For example, in February 2012 (after a nearly year long gap in treatment), the only positive physical examination finding noted by Dr. Galvin was that Moore was "slightly tight" on the right.  (Tr. 191.)  The following month, Moore reported only "mild generalized myalgias," indicated he was "feeling good," and

stated his symptoms had improved.  (Tr. 241.)  In July and September 2012, Dr. Khan noted "mildly" decreased lumbar range of motion with some concordant pain and tenderness, and a "slow" or "slightly antalgic" gait.[3]  (Tr. 196, 222-223.)

In addition to relying on the many normal or mild physical examination findings set forth above in formulating the RFC, the ALJ also determined "[t]he medical evidence of record shows the claimant is able to move about effectively despite the pain and discomfort."  (Tr. 21.)  This finding is supported by substantial evidence in the record.  As noted above, Moore's physicians frequently noted normal motor strength, negative straight leg raise, normal sensation, and no evidence of muscle spasms or scoliosis.  (Tr. 191, 196, 222, 226-230, 238, 250-251, 325.)  Additionally, the record contains numerous findings of normal gait and intact heel to toe walk, as well as references to Moore's ability to independently ambulate and climb stairs without an assistive device.  (Tr. 238, 250-251, 228, 325.)  Further, while Moore testified he sometimes used a cane, he points to no evidence that any treating source prescribed him a cane during the relevant time period.  Finally, Moore himself testified during the hearing that he was able to climb the stairs to his apartment, go grocery shopping, occasionally mow the lawn, and ride his bike short distances.  (Tr. 38-39, 63.)

The objective test results provide further support for the ALJ's conclusion Moore could perform a reduced range of light work.  With regard to Moore's lumbar spine, the October 2010, July 2012, and June 2013 x-rays showed some degenerative changes but were relatively benign.  For example, the October 2010 lumbar x-ray showed "very minimal" disc space narrowing at

---

[3] While Moore's physical therapists noted "slow and antalgic gait" in July and August 2012, the record reflects Dr. Khan noted only a "slightly antalgic" gait in September 2012 (Tr. 196) and a slow but normal gait in June 2013 (Tr. 250-251.)

L5-S1 with "marginal" osteophytic changes to varying degrees. (Tr. 343.) The July 2012 lumbar x-ray revealed degenerative changes with "no acute osseous abnormality." (Tr. 196.) The June 2013 x-ray showed some degenerative changes with "marginal osteophytes" and "no significant interval progression in the degenerative process" when compared to the July 2012 x-ray. (Tr. 262-263.) Finally, the July 2013 MRI of Moore's lumbar spine was "essentially unremarkable," with "mild" degenerative changes of L3-L4 and L4-L5, no significant thecal sac compression or foraminal stenosis narrowing, and no nerve root compression. (Tr. 254.) With regard to Moore's right hip, the October 2010 x-ray of Moore's right hip was also characterized as "essentially unremarkable." (Tr. 344.) Finally, while the August 2012 EMG of Moore's bilateral lower extremities did show denervation at the L4/L5 level, the ALJ correctly notes there was no electrodiagnostic evidence either of radiculopathy to the muscles distal to this point, or of peripheral neuropathy. (Tr. 194, 197.)

The Commissioner also correctly notes the RFC is supported by the opinions of state agency physicians Drs. Green and Torello, both of whom concluded Moore retained the capacity to perform a reduced range of light work consistent with the RFC. (Tr. 77-79, 88-90.) Notably, Moore does not direct this Court's attention to any treating physician opinion in the record supporting Moore's argument that more restrictive limitations than those set forth in the RFC are warranted.

Moore nonetheless argues the RFC is not supported by substantial evidence because the ALJ improperly relied on his "sporadic" activities of daily living. (Doc. No. 13 at 11.) This argument is without merit. The ALJ acknowledged Moore's testimony he has difficulty with some activities of daily living, including dressing himself, getting in and out of the tub, and

doing the laundry.  (Tr. 18.)  However, the ALJ also noted Moore "stated he goes outside daily, he is able to drive, he shops in stores for quick trips, he is capable of handling finances, and at times he mows the lawn."  (Tr. 21.)  In addition, the ALJ correctly cited Moore's hearing testimony that he cooks and prepares meals, grocery shops, and occasionally rides a bike.  (Tr. 18.)  The Court finds it was not improper for the ALJ to rely on Moore's ability to perform these daily activities as one factor in determining Moore could perform a reduced range of light work as set forth in the RFC.  The ALJ's findings are supported by substantial evidence in the record (*see e.g.*, Tr. 38-39, 40, 62-63) and an appropriate consideration both when formulating the RFC and (as discussed below) in assessing Moore's credibility.  *See Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 392 (6th Cir. 2004) ("The administrative law judge justifiably considered [the claimant's] ability to conduct daily life activities in the face of his claim of disabling pain.").

Moreover, in determining Moore's RFC, the ALJ did not rely solely on the nature and extent of Moore's activities of daily living, but also properly relied on the numerous normal physical examination findings in the record as well as the generally benign objective test results discussed above.  *See e.g., Walker v. Comm'r of Soc. Sec.*, 2016 WL 692548 at * 16 (S.D. Ohio Feb. 22, 2016) ("According to Plaintiff, the ALJ erred in relying on his activities of daily living because they fall short of establishing an ability to engage in full-time employment. Plaintiff's argument is unavailing because the ALJ did not rely exclusively on his activities of daily living in formulating his RFC or assessing his credibility.  Rather, the ALJ properly considered Plaintiff's activities of daily living as one of several factors."); *Rodriguez v. Comm'r of Soc. Sec.*, 2017 WL 1362701 at * 5 (E.D. Mich. Feb. 21, 2017) ("In this case, where the ALJ considered the relevant medical evidence—including Rodriguez's treatment notes and statements made to

his physicians—as well as Rodriguez's activities of daily living, the Court finds that the ALJ acted squarely within his authority in determining Rodriguez's RFC.")

Finally, the Court rejects Moore's argument that remand is required because the ALJ "failed to recognize . . . various findings that consistently demonstrate the seriousness of Plaintiff's condition, and the profound limitations imposed by the same." (Doc. No. 13 at 11.) As set forth above, the ALJ fully discussed the medical evidence regarding Moore's degenerative disc disease, including the many objective test results and physical examination findings in the record. In so doing, the ALJ expressly recognized objective test results showing degenerative changes in Moore's lumbar spine, as well abnormal physical examination findings such as tenderness, pain, decreased range of motion, and antalgic gait. However, the ALJ found Moore was "able to move about effectively despite the pain and discomfort" and characterized his "radiology reports and his examinations [as] generally good," both of which findings are supported by substantial evidence in the record for the reasons discussed above. Moreover, Moore cites no opinion evidence in the record supporting his assertion that he is limited to sedentary work or that more "profound limitations" are warranted.

Accordingly, and for all the reasons set forth above, the Court finds the RFC is supported by substantial evidence in the record. Moore's argument to the contrary is without merit.

### Credibility

Moore also argues the ALJ's credibility analysis is "flawed" for several reasons. (Doc. No. 13 at 10-11.) Specifically, he argues the objective evidence and physical examination findings "provide support for Plaintiff's symptoms and the severity of the same." (*Id*. at 10.)

28

Moore also asserts "[t]he fact the plaintiff is able to drive short distances, take quick shopping trips, handle his finances, and occasionally mow his lawn (with this son's help) is not a sound basis for an adverse credibility finding." (*Id*. at 11.)

The Commissioner argues the ALJ's credibility assessment is supported by substantial evidence in the record. She maintains the ALJ thoroughly and properly considered the objective medical evidence, medical opinions, and evidence of daily activities in assessing Moore's subjective complaints. (Doc. No. 15 at 10-14.)

It is well settled that pain alone, if caused by a medical impairment, may be severe enough to constitute a disability. *See Kirk v. Sec' of Health and Human Servs*., 667 F.2d 524, 538 (6th Cir. 1981), *cert. denied*, 461 U.S. 957, 103 S.Ct. 2428, 77 L.Ed.2d 1315 (1983). When a claimant alleges symptoms of disabling severity, the ALJ must follow a two-step process for evaluating these symptoms. *See e.g, Massey v. Comm'r of Soc. Sec*., 2011 WL 383254 at * 3 (6th Cir. Feb. 7, 2011). First, the ALJ must determine if there is an underlying medically determinable physical or mental impairment that could reasonably be expected to produce a claimant's symptoms. Second, the ALJ "must evaluate the intensity and persistence of [the claimant's] symptoms so that [the ALJ] can determine how [those] symptoms limit [the claimant's] capacity for work." 20 C.F.R. § 404.1529(c)(1). *See also* SSR 96–7p, 1996 WL 374186 (July 2, 1996).[4] Essentially, the same test applies where the alleged symptom is pain, as

---

[4] SSR 16-3p supercedes SSR 96-7p, 1996 WL 374186 (July 2, 1996), which was in effect at the time of the May 20, 2015 hearing. This Court has previously decided, in dicta, to apply SSR 16-3p retroactively. *See e.g., Anderson v. Berryhill*, 2017 WL 1326437 at fn 3 (N.D. Ohio March 2, 2017). Here, neither party addresses SSR 16-3p's applicability. District courts within this Circuit have disagreed regarding the retroactivity of SSR 16-3p and the Sixth Circuit has not decided the issue. *See Sypolt v. Berryhill*, 2017 WL 1169706 at fn 4 (N.D. Ohio March 8, 2017) *(*applying SSR 16-3p

the Commissioner must (1) examine whether the objective medical evidence supports a finding of an underlying medical condition; and, if so, (2) whether the objective medical evidence confirms the alleged severity of pain arising from the condition or whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain. *Duncan v. Secretary of Health & Human Services*, 801 F.2d 847, 853 (6th Cir. 1986). *See also Felisky v. Bowen*, 35 F.3d 1027, 1038–39 (6th Cir. 1994); *Pasco v. Comm'r of Soc. Sec.*, 137 Fed. Appx. 828, 834 (6th Cir. June 23, 2005).

If these claims are not substantiated by the medical record, the ALJ must make a credibility determination of the individual's statements based on the entire case record. Credibility determinations regarding a claimant's subjective complaints rest with the ALJ. *See Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 248 (6th Cir. 2007) ("noting that "credibility determinations regarding

retroactively); *Clayton v. Comm'r of Soc. Sec.*, 2016 WL 5402963 at * 6 (E.D. Mich. Sept. 28, 2016) (applying SSR 16-3p but not directly addressing issue of retroactivity); *Carpenter v. Comm'r of Soc. Sec.*, 2017 WL 1038913 at * 11 (N.D. Ohio March 17, 2017) (applying SSR 16-3p but not directly addressing issue of retroactivity). *But see Murphy v. Comm'r of Soc. Sec.*, 2016 WL 2901746, at n. 6 (E.D. Tenn. May 18, 2016) (declining to apply SSR 16-3p retroactively); *Withrow v. Comm'r of Soc. Sec.*, 2016 WL 4361175 at fn 5 (S.D. Ohio Aug. 16, 2016) (same); *Richards v. Comm'r of Soc. Sec.*, 2017 WL 892345 at fn 5 (E.D. Mich. Feb. 16, 2017); *Davis v. Astrue*, 2016 WL 5957616 at fn 2 (W.D. Tenn. Oct. 14, 2016) (same); *Baker v. Comm'r of Soc. Sec.*, 2016 WL 4361174 at fn 2 (S.D. Ohio Aug. 16, 2016); *Scott v. Berryhill*, 2017 WL 875480 at fn 7 (E.D. Ky. March 3, 2017). The Sixth Circuit, while declining to reach the retroactivity issue, has characterized SSR 16-3p as merely eliminating "the use of the word 'credibility' ... to 'clarify that subjective symptom evaluation is not an examination of an individual's character.' " *Dooley v. Comm'r of Soc. Sec.*, 656 Fed. Appx. 113, 119 n.1 (6th Cir. 2016). The Court perceives the issue to be largely academic here; Moore makes no argument that applying SSR 16-3p over SSR 96-7p would change the outcome. As discussed above, the ALJ evaluated Moore's complaints against the objective medical evidence and did not judge his character. In any event, the Court's evaluation of Moore's credibility argument herein would be the same applying either SSR 16-3p or SSR 96-7p.

subjective complaints rest with the ALJ").  The ALJ's credibility findings are entitled to considerable deference and should not be discarded lightly.  *See Villareal v. Sec'y of Health & Human Servs.*, 818 F.2d 461, 463 (6th Cir. 1987).  Nonetheless, "[t]he determination or decision must contain specific reasons for the finding on credibility, supported by evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individuals statements and the reason for the weight."  SSR 96–7p, Purpose Section, 1996 WL 374186 (July 2, 1996); *see also Felisky*, 35 F.2d at 1036 ("If an ALJ rejects a claimant's testimony as incredible, he must clearly state his reason for doing so").[5]

To determine credibility, the ALJ must look to medical evidence, statements by the claimant, other information provided by medical sources, and any other relevant evidence on the record.  *See* 20 C.F.R. §404.1529; SSR 96–7p, Purpose, 1996 WL 374186 (July 2, 1996).  Beyond medical evidence, there are seven factors that the ALJ should consider.[6]  The ALJ need

---

[5] SSR 16-3p similarly provides that an ALJ's "decision must contain specific reasons for the weight given to the individual's symptoms ... and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." SSR 16-3p, 2016 WL 1119029 at *9.

[6] The seven factors are: (1) the individual's daily activities; (2) the location, duration, frequency, and intensity of the individual's pain; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; (6) any measures other than treatment the individual uses or has used to relieve pain or other symptoms; and (7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.  *See* SSR 96–7p, Introduction and SSR 16-3p, 2016 WL 1119029 at * 7; *see also Cross v. Comm'r of Soc. Sec.*, 373 F. Supp.2d 724, 732–733 (N.D. Ohio 2005) (stating that an ALJ, in a unified statement, should explain his or her credibility findings in terms of the factors set forth in the regulations, thereby permitting the court to "trace the path of the ALJ's reasoning.")

not analyze all seven factors, but should show that he considered the relevant evidence.  *See*

*Cross*, 373 F. Supp.2d at 733; *Masch v. Barnhart*, 406 F. Supp.2d 1038, 1046 (E.D. Wis. 2005).

The Court finds the ALJ did not improperly assess Moore's credibility.  The decision

thoroughly considered both the medical and opinion evidence regarding Moore's physical

impairments.  (Tr. 18-21.)  As set forth above, the ALJ provided a number of specific reasons for

finding Moore to be less than fully credible, including the lack of objective test results to support

Moore's claims regarding the severity of his impairments, the numerous normal physical

examination findings in the record, and the nature and degree of his daily activities.  (Tr. 21.)

The reasons provided by the ALJ for finding Moore's statements regarding the nature

and severity of his impairments "not entirely credible" are supported by substantial evidence.  As

the ALJ correctly noted (and as discussed at length above), numerous treatment records

documented normal physical examination findings, including normal lordotic curve, no evidence

of scoliosis, normal range of motion, no evidence of spasm or trigger points, negative straight leg

raise, 5/5 motor strength, normal sensory exam, normal fine motor coordination, normal gait, and

intact heel and toe walk.  (Tr. 191, 196, 220-225, 226-230, 238, 325, 340.)  Additionally, the

objective test results in the record contained relatively benign findings, including: (1) the

October 2010 lumbar x-ray showed "very minimal" disc space narrowing at L5-S1 with

"marginal" osteophytic changes to varying degrees (Tr. 343); (2) the July 2012 lumbar x-ray

revealed degenerative changes with "no acute osseous abnormality" (Tr. 196); (3) the June 2013

lumbar x-ray showed some degenerative changes with "marginal osteophytes" and "no

significant interval progression in the degenerative process" when compared to the July 2012 x-

ray (Tr. 263); and (4) the July 2013 MRI of Moore's lumbar spine was "essentially

unremarkable," with "mild" degenerative changes of L3-L4 and L4-L5, no significant thecal sac compression or foraminal stenosis narrowing, and no nerve root compression (Tr. 254.)

Moore argues the credibility analysis is flawed because the ALJ misrepresented the true extent of his daily activities. He insists the ALJ erred because "[a] claimant's sporadic daily activities may not indicate what a claimant can do on a sustained basis particularly where the claimant experiences periods of remission and exacerbation." (Doc. No. 13 at 11.) As an initial matter, the Court finds the ALJ did not mischaracterize Moore's statements regarding his daily activities. Consistent with the ALJ's findings, Moore testified during the hearing that he was able to climb the stairs to his apartment, go grocery shopping, occasionally mow the lawn, go to church, drive, and ride his bike short distances. (Tr. 38-39, 40, 41-43, 62-63.) .

While Moore complains this level of activity is inconsistent with the ability to work full-time, the Court finds the ALJ did not err in considering Moore's daily activities as one factor in her credibility determination. *See, e.g., Pasco v. Comm'r of Social Security*, 137 Fed. Appx. 828, 846 (6th Cir. 2005) (substantial evidence supported finding that plaintiff was not disabled where plaintiff could "engage in daily activities such as housekeeping, doing laundry, and maintaining a neat, attractive appearance" and could "engage in reading and playing cards on a regular basis, both of which require some concentration") (footnote omitted); *Heston v. Comm'r of Social Security*, 245 F.3d 528, 536 (6th Cir.2001) (ALJ may consider claimant's testimony of limitations in light of other evidence of claimant's ability to perform tasks such as walking, going to church, going on vacation, cooking, vacuuming, and making beds); *Bogle v. Sullivan*, 998 F.2d 342, 348 (6th Cir.1993) (a claimant's ability to perform household and social activities on a daily basis is contrary to a finding of disability); *Gist v. Secretary of Health and Human*

*Services*, 736 F.2d 352, 358 (6th Cir.1984) (a claimant's capacity to perform daily activities on a regular basis will militate against a finding of disability).

Moreover, like the RFC determination, the Court notes the ALJ's credibility determination was not based solely on Moore's ability to engage in daily activities. As set forth above, the decision also considered the lack of objective medical evidence supporting the severity of his symptoms, the gap in Moore's treatment history, and his failure to follow up with his treatment providers. (Tr. 19-21.) In sum, the ALJ considered a number of factors in assessing Moore's credibility. These factors are supported by evidence in the record and are sufficiently specific to make the basis of the ALJ's credibility analysis clear. Moore urges the Court to find that the reasons given by the ALJ do not demonstrate a lack of credibility. However, it is not this Court's role to "reconsider facts, re-weigh the evidence, resolve conflicts in evidence, decide questions of credibility, or substitute its judgment for that of the ALJ." *Reynolds v. Comm'r of Soc. Sec.*, 2011 WL 1228165 at * 2 (6th Cir. April 1, 2011) (citing *Youghiogheny & Ohio Coal Co. v. Webb*, 49 F.3d 244, 246 (6th Cir.1995)). *See also Vance v. Comm'r of Soc. Sec.*, 2008 WL 162942 at * 6 (6th Cir. Jan.15, 2008) (stating that "it squarely is not the duty of the district court, nor this court, to re-weigh the evidence, resolve material conflicts in testimony, or assess credibility.") The ALJ provided sufficient reasons for her credibility determination and supported those reasons with reference to specific evidence in the record.

Accordingly, the Court finds substantial evidence supports the ALJ's credibility assessment. Moore's argument to the contrary is without merit.

## VII.    CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the Commissioner's final decision be AFFIRMED.

                                              *s/Jonathan D. Greenberg*
                                              Jonathan D. Greenberg
                                              United States Magistrate Judge

Date: September 28, 2017

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation. 28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may waive the right to appeal the District Court's order. *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).